UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on May 7, 2012

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| | : | GRAND JURY ORIGINAL |
| v. | : | |
| | : | Violations: |
| ANTHONY C. Y. CHENG, SR., and | : | 18 U.S.C. § 371 |
| ANTHONY R. CHENG, JR., | : | (Conspiracy to Commit Bribery); |
| | : | 18 U.S.C. § 201(b)(1)(A) and (C) |
| | : | (Payment of Bribe to a Public Official) |
| Defendants. | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting, Causing an Act to |
| | : | be Done) |
| | : | |

## INDICTMENT

The Grand Jury charges that:

### COUNT ONE
(Conspiracy)

At all times material to this Indictment, unless otherwise noted:

**Introduction**

The Defendants

1. Defendant **ANTHONY C. Y. CHENG, SR.** owned, among other businesses, Tony Cheng's Mongolian Restaurant, which was located in Chinatown in the District of Columbia.

2. Defendant **ANTHONY R. CHENG, JR.** was defendant **ANTHONY C. Y. CHENG, SR.**'s son. He owned a bus company that provided interstate transportation to the public.

## The District of Columbia Taxicab Commission

3. The District of Columbia Taxicab Commission ("DCTC") was a subordinate agency within the executive branch of the District of Columbia government with exclusive authority for intrastate regulation of the taxicab industry. The DCTC, among other things, established criteria, standards, and requirements for obtaining a taxicab license, including the licensing of owners, operators, companies, associations, and fleets. It also established licensing fees. The DCTC was comprised of nine members. Five were members of the public and three were from the industry. Those members served for five-year terms and were appointed by the Mayor of the District of Columbia with the advice and consent of the District of Columbia Council. The ninth member was the chairperson, who was appointed by and served at the pleasure of the Mayor.

4. In order to operate a taxicab company in the District of Columbia, applicants were required to secure a Public-Vehicle-For-Hire Operator's license (hereinafter "Operating Authority License") from the DCTC. Generally, applicants were required to provide letters vouching for their sobriety, honesty, and general good character. The applicants were also required to pass a criminal background check and the "clean hands" requirement (stating that the applicant was current on the payment of all local taxes and had no outstanding fines).

5. On or about November 25, 2008, the DCTC imposed a legislatively mandated moratorium that prohibited the issuance of any new Operating Authority Licenses to operate any new taxicab companies, taxicab associations, limousine companies, and independently operated (single-vehicle) limousine operations. The moratorium was set to expire on or about November 25, 2010, but was extended through at least on or about September 30, 2011.

2

6. From on or about July 7, 2007, through on or about April 26, 2011, an individual was the Chairperson of the DCTC (hereinafter "Public Official Number One"). As Chairperson, Public Official Number One was the chief administrative officer of the DCTC and was in charge of the organization and administration of the DCTC. As part of his official duties and responsibilities, Public Official Number One had the discretion and authority to issue licenses to operate multi-vehicle taxicab companies in the District of Columbia.

The District of Columbia Department of Consumer and Regulatory Affairs

7. The District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"), an agency of the District of Columbia government, was responsible for protecting the health, safety, economic interests, and quality of life of residents, businesses, and visitors in the District of Columbia. The DCRA issued licenses and permits, conducted inspections, enforced building, housing, and safety codes, regulated land use and development, and provided consumer education and advocacy services.

8. District of Columbia regulations required that all property owners obtain a Certificate of Occupancy to ensure that the use of buildings, structures and land in the District of Columbia conformed to the Zoning Regulations, and to the provisions of the District of Columbia Building Code. Generally, a Certificate of Occupancy was required to use a building, structure and land in the District of Columbia for any purpose other than a single-family dwelling. Therefore, any building that housed a multi-vehicle taxicab company in the District of Columbia was required to have a Certificate of Occupancy.

9. As part of an undercover investigation, an undercover Special Agent of the Federal Bureau of Investigation (hereinafter, "Public Official Number Two"), was introduced and known

to defendant **ANTHONY R. CHENG, JR.** as a DCRA public official who had the authority to issue Certificates of Occupancy on behalf of the DCRA.

## The Conspiracy

10. From in or about November 2010, through in or about June 2011, during the period of the moratorium on the issuance of new Operating Authority Licenses, in a continuing course of conduct, in the District of Columbia and elsewhere, defendants **ANTHONY C. Y. CHENG, SR.** and **ANTHONY R. CHENG, JR.**, and others known and unknown to the grand jury (the "Conspirators"), knowingly and willfully conspired and agreed with each other, and with other persons both known and unknown to the grand jury, to commit the following offense against the United States: that is, to directly and indirectly, corruptly give, offer, and promise things of value to District of Columbia public officials in return for those public officials' providing them with backdated government documents, including Operating Authority Licenses and Certificates of Occupancy, which documents would allow the defendants to operate multi-vehicle taxicab companies, in violation of Title 18, United States Code, Section 201(b) (Bribery of a Public Official).

## A Goal of the Conspiracy

11. It was a goal of the conspiracy for the Conspirators to unlawfully enrich themselves by making corrupt payments and attempting to make corrupt payments to District of Columbia public officials for the purpose of illegally obtaining the licenses and certificates necessary to operate multi-vehicle taxicab companies.

**Manner and Means of the Conspiracy**

12. The manner and means by which defendants **ANTHONY C. Y. CHENG, SR.** and **ANTHONY R. CHENG, JR.**, and other unindicted co-Conspirators, both known and unknown to the Grand Jury, accomplished a goal of the conspiracy included, but were not limited to, the following:

(a) Defendants **ANTHONY C. Y. CHENG, SR.** and **ANTHONY R. CHENG, JR.** met and discussed with Public Official Number One taxicab-related business opportunities, and agreed to pay Public Official Number One ten percent (10%) of the profits from such business opportunities, if Public Official Number One would assist defendants in procuring the necessary licenses and certificates to operate multi-vehicle taxicab companies;

(b) The defendants participated in meetings and had discussions in which Public Official Number One explained that there was a moratorium in place that prohibited the issuance of any new Operating Authority Licenses for taxicab companies, but that "for a contribution," he could arrange for Operating Authority Licenses to be backdated for the defendants to operate multi-vehicle taxicab companies, and could also arrange for backdated Certificates of Occupancy to be issued for the defendants' multi-vehicle taxicab companies;

(c) The Conspirators played different roles in the conspiracy, and took upon themselves different tasks in furtherance of the conspiracy, including recruiting family members to sign backdated corporate documents to falsely represent that the taxicab companies had been in existence since 2009 and that each of the taxicab companies had a

5

net worth of $1,135,000; collecting approximately $1,500 in cash to be used as a bribe payment to Public Official Number One; and collecting approximately $250 in cash to be used as a bribe payment to Public Official Number Two;

(d) Defendant **ANTHONY R. CHENG, JR.** met with Public Official Number One to provide Public Official Number One with backdated paperwork to corruptly obtain Operating Authority Licenses for multi-vehicle taxicab companies;

(e) Defendant **ANTHONY C. Y. CHENG, SR.** met with Public Official Number One and paid Public Official Number One cash to corruptly obtain Operating Authority Licenses for multi-vehicle taxicab companies; and

(f) Defendant **ANTHONY R. CHENG, JR.** met with Public Official Number Two and paid Public Official Number Two cash to corruptly obtain backdated Certificates of Occupancy.

### Overt Acts

13. In furtherance of the conspiracy and in order to achieve the goals thereof, the defendants and other Conspirators, known and unknown to the grand jury, within the District of Columbia and elsewhere, committed overt acts, including, but not limited to the following:

(a) On or about January 25, 2011, defendants **ANTHONY C. Y. CHENG, SR.** and **ANTHONY R. CHENG, JR.** met with Public Official Number One, at which time they discussed the method by which they would corruptly obtain licenses for multi-vehicle taxicab companies, including the preparation of applications, the location for meetings, and the amount of cash to be paid to Public Official Number One and others who were needed to assist Public Official Number One;

(b) On or about January 27, 2011, defendant **ANTHONY R. CHENG, JR.** spoke to Public Official Number One by telephone, at which time they discussed names for multi-vehicle two taxicab companies for which Public Official Number One would assist in obtaining Operating Authority Licenses, and discussed that a "contribution" of not more than $1,500 would be needed to obtain backdated documents and to have those documents entered into the DCTC computer database;

(c) On or about January 31, 2011, defendant **ANTHONY R. CHENG, JR.** met with Public Official Number One at Public Official Number One's office, at which time Public Official Number One provided defendant **ANTHONY R. CHENG, JR.** with two applications for Operating Authority Licenses for two multi-vehicle taxicab companies, and asked that defendant **ANTHONY R. CHENG, JR.** take them with him and fill them out;

(d) On or about January 31, 2011, defendants **ANTHONY C. Y. CHENG, SR.** and **ANTHONY R. CHENG, JR.** met with Public Official Number One at Tony Cheng's Mongolian Restaurant. Public Official Number One provided the defendants with a "2010 Operating Authority License issued to Anthony Cheng trading as Green Top Cab" and a "2010 Operating Authority License issued to Anthony Cheng trading as ECO CAB Company," both backdated to January 5, 2010. In addition, Public Official Number One provided the defendants with a "2011 Operating Authority License issued to Anthony Cheng trading as Green Top Cab" and a "2011 Operating Authority License issued to Anthony Cheng trading as ECO CAB Company," both backdated to January 11, 2011. The defendants knew that all of the Operating Authority Licenses were backdated.

Defendant **ANTHONY R. CHENG, JR.** placed his signature on all four Operating Authority Licenses for the multi-vehicle taxicab companies;

(e) On or about January 31, 2011, during the meeting at Tony Cheng's Mongolian Restaurant, defendant **ANTHONY C. Y. CHENG, SR.** gave Public Official Number One approximately $1,500 in cash as payment for the backdated Operating Authority Licenses for multi-vehicle taxicab companies;

(f) On or about February 7, 2011, defendant **ANTHONY R. CHENG, JR.** met with Public Official Number One at the DCTC Office and delivered the two completed applications for the Operating Authority Licenses that Public Official Number One had provided to the defendants on January 31, 2011. Both applications contained an executed "Certificate of Identity - Business Licensees," which listed defendant **ANTHONY R. CHENG, JR.** as president, defendant **ANTHONY C. Y. CHENG, SR.** as Vice President, and a close relative of the defendants as Secretary/Treasurer. The applications also contained a "Confidential Statement of Financial Fitness" which indicated that each taxicab company had a net worth of $1,135,000.

(g) On or about February 16, 2011, defendant **ANTHONY R. CHENG, JR.** spoke to Public Official Number One by telephone, at which time they discussed obtaining backdated Certificates of Occupancy from the DCRA. Public Official Number One told defendant **ANTHONY R. CHENG, JR.** that he had a contact at the DCRA (Public Official Number Two) who would be willing to provide the backdated Certificates of Occupancy for $500. Public Official Number One offered to pay $250 of

the $500 payment to Public Official Number One, and defendant **ANTHONY R. CHENG, JR.** agreed to pay the other $250; and

(h) On or about March 31, 2011, defendant **ANTHONY R. CHENG, JR.** met with Public Official Number Two, at which time he paid $250 in cash to Public Official Number Two in return for backdated Certificates of Occupancy for the two multi-vehicle taxicab companies.

**(Conspiracy to Commit Bribery, Aiding and Abetting, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 371 and 2)**

## COUNT TWO
**(Payment of Bribe to a Public Official)**

14. The allegations set forth in paragraphs 1 through 9 and 11 through 13 of this Indictment are incorporated by reference as if set out in full.

15. On or about January 31, 2011, in the District of Columbia, defendants **ANTHONY C. Y. CHENG, SR.** and **ANTHONY R. CHENG, JR.** did, directly and indirectly, corruptly give, offer, and promise a thing of value to Public Official Number One, with the intent to influence an official act, that is, defendants **ANTHONY C. Y. CHENG, SR.** and **ANTHONY R. CHENG, JR.** gave cash to Public Official Number One in exchange for Public Official Number One providing them with Operating Authority Licenses for two multi-vehicle taxicab companies.

**(Payment of a Bribe to a Public Official, in violation of Title 18, United States Code, Sections 201(b)(1)(A) and 2)**

## COUNT THREE
### (Payment of Bribe to a Public Official)

16. The allegations set forth in paragraphs 1 through 9 and 11 through 13 of this Indictment are incorporated by reference as if set out in full.

17. On or about March 31, 2011, in the District of Columbia, defendant **ANTHONY R. CHENG, JR.** did, directly and indirectly, corruptly give, offer, and promise a thing of value to Public Official Number Two, with the intent to influence an official act, that is, defendant **ANTHONY R. CHENG, JR.** gave cash to Public Official Number Two in exchange for Public Official Number Two providing two backdated Certificates of Occupancy for two multi-vehicle taxicab companies.

(Payment of a Bribe to a Public Official, in violation of Title 18, United States Code, Sections 201(b)(1)(A) and 2)

A TRUE BILL

FOREPERSON

ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA